<u>AFFIDAVIT</u>

I, Paul J. Moloney, Special Agent of the Drug Enforcement Administration (DEA), Washington Division Office (WDO), Washington, DC, (hereinafter Affiant) being duly sworn, depose and state the following:

<u>Introduction</u>

1.  I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United State Code Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for the offenses enumerated in Section 2515 of Title 18, United States Code.

2.  I have been a Special Agent (SA) with the DEA since 1997.  I am currently assigned to Enforcement Group Forty-six at the Washington Division Office, located in the District of Columbia.  While with the DEA, I have investigated, and assisted in the investigation of, hundreds of narcotics violators.  I have previously participated in investigations which have led to the arrest and conviction of narcotics dealers.  Since 1999, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of

other investigative tools available to law enforcement officers. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies. In the course of conducting these investigations, your Affiant has been involved in the use of the following investigative techniques: interviewing informants and Cooperating Sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, and other contraband.

    3.    Based on your Affiant's training, experience, and participation in narcotic and drug-related investigations and the training and experience of other Agents with whom I am working closely with in this investigation, your Affiant knows that:

a)  Individuals who deal in illegal controlled substances maintain books, records receipts, notes, ledgers, bank records, money orders, and other documents relating to the importation, manufacture, transportation, ordering, sales, purchase, and distribution of illegal controlled substances.  These books, records, receipts, ledgers, money orders, etc., are maintained where the dealers in those illegal controlled substances have ready access to them, such as in a secure location within their residences, the residences of family members, friends and associates, in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated or otherwise has some degree of command or control over.

b)  Individuals who deal in illegal controlled substances routinely conceal in their residences and/or the residences of family members, friends and associates, as well as their business locations, and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, large quantities of

      currency, financial instruments, precious stones/metals, jewelry, electronics equipment, and other items of value, which typically are proceeds of illegal controlled substance transactions.

c)   It is common for individuals who deal in the sale of illegal controlled substances, particularly methamphetamine, to secrete contraband related to the activity, such as scales, razors, packaging materials, cutting agents, glassware, microwave ovens, laboratory equipment, chemicals, pots, pans, dishes, and other items used in the preparation and packaging of methamphetamine at their residences, or the residences of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

d)   Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or other documents which reflect the names, addresses, and/or telephone numbers for their associates in their illegal drug organization. These

       individuals utilize cellular telephones and pagers, which reflect names, addresses, and/or telephone systems to maintain contact with their associates in their illegal drug businesses. These telephone records, bills and pager numbers are often found in their place of residence, or the residence of family members, friends, or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

e) Individuals who deal in the illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband. These photos are usually maintained in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

f) Individuals who deal in the distribution of illegal controlled substances often maintain records relative to their drug trafficking activities. These records and documents are usually secreted in their places of residence, or

      the residences of family members, friends, or associates, in their businesses, or in the places of operation of the drug distribution activity such as a stash house or safe house. These documents often include ledgers, account books, calculations, or other notations which reflect inventories and quantities of narcotics purchased and distributed.  The documents also may include "pay-owe sheets," which are documents that bear calculations, customers names, quantities, and prices.  The notations made on or in these documents are often encrypted by the trafficker in an attempt to disguise the true nature of the records from law enforcement.

g)   Individuals who distribute illegal controlled substances maintain documents, letters, and records relating to the illegal activity for long periods of time.  This documentary evidence is usually secreted in their places of residence, or the residences of family members, friends, or associates, in their businesses, or in the places of operation of the drug distribution activity such as a stash house or safe house.  This documentary evidence includes, but is not limited

        to, telephone numbers, telephone books, address books, credit card receipts, hotel receipts, train and bus tickets, airline boarding passes or itineraries, baggage claim tickets, car rental receipts, amounts and records in fictitious names, false identification documents, money orders, casino receipts, account notations, "pay-owe sheets," cashiers checks relating to transactions, and other records indicating the existence of storage facilities used in narcotics trafficking.

h) Individuals involved in the trafficking of illicit narcotics often own, possess, and/or use weapons as a means to facilitate their drug trafficking activities. These weapons are most often secreted in their residences, the residences of family members, friends or associates, in their business locations, or in the places of drug distribution activity, such as a stash house or safe house.

4. Based on the investigation in which your affiant has participated in and for the reasons which will be set forth herein, there is probable cause to believe that XXXXXXXX X. XXXXXXX, and several of his associates,

known and unknown, are committing the following federal offenses: (i) possession with the intent to distribute controlled substances, in violation of Title 21 United States Code, §841 (a)(1); (ii) conspiracy to commit such offenses, in violation of Title 21 United States Code, § 846; (iii) use of communications facilities in the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code, § 843(b).  In addition, I believe for the reasons to be set forth infra, there is probable cause to show that within, XXXX XXXX XXXXXX, XX, XXXX, XXXXXXXXXX, XX, there is evidence of those crimes and that residence has been, and will continue to be used, by XXXXXXX X XXXXXXX and his associates in furtherance of the crimes enumerated above.

5.   Throughout this investigation, law enforcement officers and agents have worked together to collect and record information about the illegal activities of those under investigation.  This affidavit is based in part on personal knowledge derived from the participation of your Affiant in the investigation, and in part, upon the sources of information and belief.  The sources of information and belief include statements made by defendants, witnesses, or other cooperating sources of information, observations made by undercover officers, and

subpoenaed information including cellular telephone billing records.

      6.   Not every fact known to this investigation or by the government is set forth in this affidavit. Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.  I believe the information presented in this affidavit will establish probable cause to show that XXXXXXX X XXXXXXX and his associate have been and are currently engaged in those crimes enumerated above and that there is evidence of those crimes within the residence located at XXXX XXXX XXXXXX, XX, XXXX, XXXXXXXXXX, XX. Therefore, only those aspects known to this investigation which support that probable cause are presented in this affidavit.

<u>The Target Address</u>

      7.   This affidavit is respectfully submitted in support of an application for a warrant to search XXXX XXXX XXXXXX, XX, XXXX, XXXXXXXXXX, XX, hereinafter referred to as the "Target Address."  The Target Address is described as an apartment located on the third floor of a multi-unit building known as "XXX XXXX XXXXXX."  The front entrance of

the building is clearly marked "XXXX XXXX XXXXXX" displayed on a beige colored awning over the front doors. The front door of apartment XXX is greenish-gray in color and appears to be constructed of metal. The numerals "XXX" are clearly displayed in white numerals on a dark brown plastic plate affixed to the top center of the door. Further inspection of the door will reveal a peep-hole also affixed to the top center of the door.

## PROBABLE CAUSE

8.   In February 2003, Agents of the Drug Enforcement Administration (DEA) began an investigation of an organization responsible for the shipment of methamphetamine into the Northern Virginia from a source in Southern California. Members of this organization re-distributed the methamphetamine to a network of customers in Northern Virginia and the metropolitan area of the District of Columbia.

9.   Amongst the number of organization members identified was Washington, DC, resident XXXXXXX X XXXXXXX (hereafter XXXXXXXX). XXXXXXXX had been identified as receiving multiple pounds of methamphetamine from a source in Southern California and re-distributing the methamphetamine to a customer base in the metropolitan area of the District of Columbia. In addition, several of these

cooperating sources indicated that XXXXXXXX utilized the Target Address to facilitate his drug trafficking activities.

<u>Cooperating Source Number One</u>

10. In or about April 2005, Cooperating Source Number One, hereafter referred to as "CS-1," began cooperating with the DEA in XXXXXXXX XXXX. CS-1 agreed to cooperate with DEA following his/her arrest on related federal conspiracy charges. The investigation revealed that CS-1 transported multiple pounds of methamphetamine from source in Southern California to customers in Northern Virginia including XXXXXXXX. As part of his/her cooperation, CS-1 agreed to meet with Special Agents and provide them with detailed information regarding his/her drug trafficking activities as well as the criminal activities of others.

11. CS-1 identified XXXXXXXX and CS-2 as one his/her customers. CS-1 estimated that from in or about June 2004 through March 2005, CS-1 shipped twenty-five pounds of methamphetamine to CS-2 on behalf of XXXXXXXX and one or more of XXXXXXXX' associates. CS-1 had come to know that upon receipt, CS-2 met with XXXXXXXX and/or XXXXXXXX' associates in order to deliver the methamphetamine. In addition, CS-2 came to know that some or all of the money

provided to him/her by CS-2 as payment for the methamphetamine was supplied by XXXXXXXX.

12. CS-1 described XXXXXXXX' residence as an apartment located in Northwest Washington, DC. CS-1 had been to that residence on one occasion in the summer of 2004. At that time, CS-1 delivered one and a half pounds of methamphetamine to XXXXXXXX. While meeting with XXXXXXXX, CS-1 collected money as payment for the methamphetamine.

13. CS-1 identified two telephone numbers as being in the use of XXXXXXXX. CS-1 indicated that he/she had communication with XXXXXXXX over land-line telephone number XXX-XXX-XXXX and cellular telephone number XXX-XXX-XXXX. CS-1 further indicated that he/she had negotiated the sale and delivery of methamphetamine with XXXXXXXX during conversations occurring on one or both of those telephone numbers.

## Cooperating Source Number Two

14. In July 2005, Cooperating Source Number Two, hereafter CS-2, began cooperating with DEA following his/her arrest on federal narcotics conspiracy charges in the Eastern District of Virginia. The investigation revealed that CS-2, XXXXXXXX, and a number of their associates were transporting multiple pounds of

methamphetamine into the Northern Virginia region through CS-1 and other sources. As mentioned above, the investigation revealed XXXXXXX and his associates then sold the methamphetamine for significant profit to a network of customers in Washington, DC, and elsewhere.

15. The information provided by CS-2 was corroborated to every reasonable extent possible. Special Agents compared the information provided by CS-2 to telephone records, physical evidence, and statements provided by other cooperating sources; Special Agents determined the information provided by CS-2 to be reliable.

16. In July and August 2005, Special Agents held a number of interviews with CS-2. Prior to those interviews, CS-2 signed a "proffer" agreement presented by the United States Attorney's Office. In each of those interviews, CS-2 provided detailed information pertaining to his/her methamphetamine trafficking activities.

17. CS-2 identified CS-1 as his/her source of supply. CS-2 estimated that he/she purchased fifteen pounds of methamphetamine from CS-1 once every week from February 2004 through March 2005. CS-2 indicated that during that time, he/she had purchased quantities of methamphetamine from CS-1 on behalf of XXXXXXX and one of his associates.

18.  In December 2004, CS-2 began purchasing the methamphetamine from CS-1 directly for XXXXXXXX.  In addition, CS-2 indicated that XXXXXXXX financed each purchase of methamphetamine occurring from December 2004 up to and including March 2005.  During that time period, CS-2 met with XXXXXXXX at the Target Address in order to collect the funds for the purchase of the methamphetamine.  CS-2 recalled that in May 2005, he/she met with XXXXXXXX at the Target Address and collected approximately $XXXXXX for the purchase of methamphetamine from CS-1.

19.  In addition, through 2004 and 2005, CS-2 would meet with XXXXXXXX at the Target Address to discuss the shipment of methamphetamine from CS-1.  During those meetings, CS-2 observed computers and methamphetamine stored at the Target Address. In the spring of 2004, CS-2 held a discussion with a mutual associate who indicated that he had stored drug money at the Target Address.

20.  CS-2 indicated that he/she often discussed the shipment and payment of methamphetamine with XXXXXXXX over the telephone.  CS-2 identified a land-line telephone bearing number XXX-XXX-XXXX as being in the use of XXXXXXXX and in which he/she discussed the purchase of methamphetamine with XXXXXXXX.

Other Information

21. On June 30, 2005, Special Agents received information pertaining to telephone activity of CS-2. Analysis of that information revealed that seventy-five telephone calls were exchanged between CS-2 and XXXXXXXX telephone XXX-XXX-XXXX between 2004 and December 2004.

22. In or about XXXXX XXXX, CS-1 contacted Special Agents in Washington, DC. CS-1 told Special Agents that he/she had held recent telephone conversations with CS-2 (prior to CS-2's arrest and subsequent cooperation agreement with the government). In those conversations, CS-2 negotiated the purchase of approximately one pound of methamphetamine. Following the instructions of Special Agents, CS-1 arranged to receive shipments of money sent from CS-2 as payment for future shipments of methamphetamine. At or about the time of the shipments, CS-2 provided CS-1 with description of the package. In addition, CS-2 told CS-1 that some or all of the money contained in one of the packages was furnished and counted by XXXXXXXX.

23. On or about XXXXXX XX, XXXX, with the assistance of CS-1, Special Agents identified the package sent by CS-2 and seized it prior to delivery. After obtaining a

warrant, Special Agents opened the package to find it contained approximately $XXXXXX.

24.  On or about XXXXXXX, XXXX, CS-1 contacted Special Agents in Washington, DC, by telephone.  CS-1 indicated that he/she had held recent conversations with XXXXXXXX; in one or more of those conversations, XXXXXXXX told CS-1 that he wished to purchase one pound of methamphetamine.  Following the instructions of Special Agents, CS-1 held additional conversations and arranged to meet XXXXXXXX at a location in Washington, DC, on or about August 31, 2005, in order to consummate the transaction.  Also during the conversation, XXXXXXXX indicated that he was in possession of $XXXXX in which to purchase the methamphetamine from CS-1. CS-1 indicated that he/she held the conversations with XXXXXXXX in several e-mails and in several telephone conversations.

25.  CS-1 provided copies of the e-mails sent by XXXXXXXX to Special Agents.  A review of those e-mails revealed that on August 14, 15, and 17, 2005, XXXXXXXX and CS-1 exchanged "encoded"[1] e-mails in which prices and quantities of methamphetamine to be sold is discussed.

---

[1] In the e-mails, BEAVERS and CS-1 do not specifically refer to the exchange of money for drugs; nor do they specifically discuss a time and place to meet. Drug traffickers typically do not expressly refer to these terms in an effort to elude law enforcement and to insulate

26.  On or about XXXXXXX, XX, XXXX, Special Agents have planned a "reverse"[2] operation which will ultimately lead to the arrest of XXXXXXXX.  It is anticipated that XXXXXXXX will meet with CS-1 in order to receive the methamphetamine; the delivery of which has been negotiated by XXXXXXXX in the number of telephone conversations and e-mails held with CS-1.  Upon completing the exchange, Special Agents will place XXXXXXXX under arrest.  XXXXXXXX will be charged with conspiracy and other federal violations in Eastern District of Virginia.

---

themselves from being robbed by other rival traffickers.  Often, traffickers will wait to discuss these terms in direct conversation.
[2] A reverse is described as an investigative operation where an agent of the government poses as a source of supply.  Often, a "representative sample" of controlled substances is furnished to an investigative target.  The target is then placed under arrest immediately following the delivery of the representative sample.

CONCLUSION

Based on all of the forgoing information presented in this affidavit, I submit there is probable cause to believe that XXXXXXX X XXXXXXX and several of his associates, known and unknown, utilized the residence, XXXX XXXX XXXXXX, XX, XXXX, XXXXXXXXXX, XX, to facilitate those violations described above, and that within that residence is evidence of crimes to include documents, records, and other items further described in <u>Schedule A</u> listed in the attachment to this affidavit.

_____
Paul J. Moloney
Special Agent
Drug Enforcement
Administration

SWORN TO AND SUBSCRIBED Before Me this 31st day of August 2005.

_____
United States Magistrate Judge
District of Columbia